DECORAH STATE BANK, Appellee, v. WILLIAM P. SEXTON et al., Appellants.

No. 43123.

1048

DECEMBER 17, 1935.

E. P. Shea, and Campbell & Campbell, for appellants.

A. C. Lynch, for appellee.

PARSONS, J.—This is an action for the foreclosure of a mortgage in which the Decorah State Bank is plaintiff and appellee, and William P. Sexton and Mary B. Sexton are defendants and appellants.

The mortgage was given on 240 acres of land in Winneshiek county to secure the payment of several notes aggregating $14,800, all given at the time the mortgage was given, on the 2d day of January, 1930. The petition was an ordinary petition for foreclosure of a mortgage, and was filed on the 19th day of January, 1935. The notes all bear interest at 5½ per cent per annum, payable annually, with a defaulting clause that principal and interest draw interest at the rate of 8 per cent per annum, payable annually.

The defendants filed no answer to the petition, but on the 7th of February, 1935, filed a motion for continuance to March 1, 1937, as provided in the Emergency Debtors' Relief Act of the Acts of the 46th General Assembly of the State of Iowa, ch. 115, and in the application stated they owned the real estate which was the subject-matter of the action, and asked the court for an order for possession of said real estate, giving preference to defendant owners, and to determine the fair rental terms to be paid by the parties in possession, and to provide for the distribution of the rents, income, and profits from said real

estate, as would be just and equitable during the continuance of this cause.

A resistance was filed to this motion on the 15th of February, 1935, setting forth the defendants were possessed of a large amount of unencumbered property, both real and personal, and were financially able to discharge their obligations to the plaintiff without hardship to themselves, and were not of the class of debtors for whom the Moratorium Acts were provided; that said defendants did not live upon the premises upon which foreclosure was asked; and maintained that an order for such continuance would not be equitable nor in accord with the spirit of the Mortgage Moratorium Act.

The reply to the resistance set forth that the defendants owned other property in addition to the land which was the subject-matter of the action, but denied that the same was unencumbered, and alleged that the personal property owned by defendants was subject to a chattel mortgage in the sum of $1,900; they admitted they did not live on the premises in question, and set forth that the farm upon which foreclosure is asked was purchased by defendants in the year 1922 for $31,600, paying $6,600 of that amount in cash, and in addition thereto transferred other real estate to the seller, of the valuation of $10,200, and assumed the mortgage upon which foreclosure is asked; that since they became the owners of the land subject to the mortgage they had spent large sums of money improving same, etc.; had paid their interest promptly, with the exception of the payment due January 2, 1935. They alleged the farm was rented for $625 cash rent. There was a hearing upon this application and resistance, and testimony was taken, from which it appears that the real estate holdings of the defendant, exclusive of the farm in question, consisted of 500 acres of clear and unencumbered land, with no taxes in default, and that they owned three houses in the town of Decorah. There was quite a lot of personal property belonging to the defendants, subject to the $1,900 mortgage to another bank. The defendants claim to have made a proposal to the plaintiff for settlement of their liabilities under the mortgage for $9,000, and offered to pay the taxes and turn over the farm, but the plaintiff did not accept.

It further appeared that when the Sextons made the deal for the mortgaged land they were trading in Canadian land,

and wanted some money in order to close the deal. The bankers told Sexton the amount asked was an excessive loan, and Sexton called the attention of the bank to the fact that he owned the other lands clear, but did not want to give a mortgage on it at the time; that he hoped to sell the farm in question in a short time and would be able to clear it all up, and he thought it would be good, in view of the fact that he owned other clear farms, that Mr. Sexton first offered $8,000 and then $9,000 in full of mortgage.

This loan of $14,800 was at the time of the trade for the land held by the Winneshiek County Bank, and as a result of the negotiations between the plaintiff and defendants the plaintiff took up the loan and advanced the money. Sexton made application for a federal loan, and received a commitment of $7,500. The bank wanted additional security. Sexton said he would not like to mortgage the rest of his real estate, and that he would not do that willingly. Sexton took the position that if the application was granted he would try to refinance the mortgage with the federal loan, *if* the rules and regulations were changed to grant more liberal terms to mortgagors in future years. Mr. Sexton was asked if they were willing to resort to any other property to finance the loan, outside of the homestead, and he answered, "Well, I would if I could get it down to where I thought I could handle it if times change." He said he did not think he could clean up the debt. The bank took the position that under the banking laws it could not loan more than 50 per cent of the present market price of the land, and that when it made its loan it was very near the border-line, and asked at that time for additional security. The cashier of the bank was asked, "Would your bank be willing to refinance this loan if this defendant would give additional security on this loan outside of his homestead?" and he answered, "Well, I don't know just how much is in the homestead." Then when he was asked if it would be 80 acres, or 40 acres with the house, he answered, "Yes sir; feel perfectly satisfied to." Sexton further testified that the taxes on the farm were delinquent in the sum of $137.61, and said he would not be willing to turn all his property over to the plaintiff on a mortgage at 5½ per cent, except 40-acre homestead and additional 40 acres. He said if a continuance were granted in this matter he would take immediate steps to refinance the mortgage, *if*

he could get it refinanced, and he would try to refinance it on the most favorable terms. He said he would pledge this additional property in attempting to refinance it, but as to the amount he would pledge, he would have to talk matters over with his wife first.

It appears from the additional abstract filed by the plaintiff that the cashier of the bank testified it did not appear to him that Sexton was going to refinance, and he did not take it that Sexton was going to or did make an offer but that he was feeling the bank out in the matter, and that he did not think any offer was made. He further said, "Well, we had this meeting with Mr. Sexton and he felt us out on these amounts that were being mentioned, eight thousand, I believe it was first, and then nine thousand, I think it was later. As I remember it, he didn't make us any definite offer of these amounts but asked us something about if we would take them and when we told him that we couldn't take them he said that's all he would do, and if we wouldn't take those he wouldn't do anything further in regard to it."

The case was then continued for a few days, and on March 27, 1935, the court overruled the motion for continuance, and decree of foreclosure was then entered. In overruling, the court spoke of the testimony, and said: "I have concluded to deny this application for Continuance for the reason that this record shows the defendant has other farms, consisting of over 500 acres, besides the land in question, which is unmortgaged, and the plaintiff in open Court expressed its willingness to refinance this loan upon the giving of additional security on this other land excluding the homestead. However, I will not enter my decision at this time and will give the defendant a reasonable time to refinance this loan with the plaintiff if he sees fit so that the additional costs of the foreclosure will not be imposed upon him."

Then there was afterwards a meeting with the court when testimony was taken, March 27, 1935, and the defendants did nothing further, except Mr. Sexton intimated he would not agree to do anything further to make the loan, and made no definite offers himself. At the conclusion of this hearing the motion for continuance was overruled and decree entered. An appeal was taken by defendants to this court.

The appellants cite in this case Mudra v. Brown, 219 Iowa

867, 259 N. W. 773; Augustana Pension and Aid Fund v. Nagle, 219 Iowa 1337, 261 N. W. 771; Federal Land Bank v. Wilmarth, 218 Iowa 339, 252 N. W. 507, 94 A. L. R. 1338.

In Mudra v. Brown, there was no showing whatever of the value of the real estate covered by the mortgage. In this case the value of the real estate, while not exactly fixed, is much below the amount of the mortgage, and, as said, the burden is upon the mortgage holder to show why the continuance should not be granted.

In the Augustana Pension and Aid case, the land was an 80-acre farm rented for $30 per month; the value of the farm was $12,000, and the indebtedness was only $8,859.78; and Nagle's present indebtedness was less than the reasonable value of the property, and he was reducing his indebtedness and had sufficient income to pay rent, and it was his homestead, a two-thirds interest belonging to minor children; that there was a prospect of selling the land at a price above the mortgaged indebtedness. The application for an extension, on these facts, was sustained.

In the Wilmarth case, it was held that the lower court did not abuse its discretion in refusing a continuance to a debtor who had substantially abandoned the mortgaged premises, and for a material time had failed to apply the rents and issues to the amount of his indebtedness.

We see nothing in these cases that in any way conflicts with the position taken by the district court in this case, and there is no difference practically in the language of the 46th General Assembly's Moratorium Act ch. 115, and that of the Acts of the 45th General Assembly, ch. 182, so the authorities under one would be authority under the other.

In the Wilmarth case it is said, on page 354:

"The purpose of the statute is to afford the owner of the land an opportunity to refinance or pay up the indebtedness and save his farm within the moratorium period."

In this case, the Sextons had gone to the bank at the time they purchased the land; there was a mortgage upon the land in the same amount as the mortgage in question. This mortgage was held by another bank. The plaintiff bank loaned the money simply to take up this mortgage at that time, trying to get some further security. No part of this mortgage has been

paid; the farm is rented at $625 a year. The interest on the mortgage by its terms is $715, the taxes amount to about $140 a year, and there are always other incidentals that have to be looked after on a farm, so this farm is continually running behind. The defendants have 500 acres of land besides, that is unencumbered. Their attitude in the case is that they do not want to pay the mortgage. They want to have the mortgage come down, first to $8,000 then to $9,000, and have really done nothing to finance the matter, except to make some inquiries and get a commitment from the federal land bank of only $7,000. What would be the result? This land evidently is not security for the mortgage; the defendants are in no way distressed; they have 500 acres of clear land; they do nothing that looks like they are trying to refinance the mortgage, beyond saying they have made some inquiries, and if Congress passes some acts and things of that sort they may do something. This is not the proper attitude for debtors to take under these circumstances. Plaintiff loaned them the money; it is entitled to its money, if the defendants have property enough to pay it, and they have. The law was not made to allow debtors to beat their creditors; if so, it would be unconstitutional because that would be an impairment of the obligation of a contract. It is just the same as if the mortgagors had $10,000 lying in a bank and refused to apply any part of it to the payment or security of their debt. Were these notes not secured by a mortgage, how far would they get on that proposition? The plaintiff could reach out and seize anything the defendants had. Defendants are offered an opportunity to extend the mortgage, provided they give some additional security, and they have refused to do it. They are not seeking equity; they are simply seeking either to delay the plaintiff in the collection of its money, or to finally beat the plaintiff out of some of it.

In Butenschoen v. Frye, 219 Iowa 570, 258 N. W. 769, this court affirmed a case in which a continuance such as was asked here was denied, holding that it was properly denied under the facts showing the mortgagor was not in financial distress, and he did not acknowledge willingness to do equity. The opinion says:

"The moratorium statute was intended for debtors in financial distress to enable them to refinance their loans, and,

if possible, pay the indebtedness due within the period of the moratorium. The motion is addressed to a court of equity and good conscience for relief and succor by one, who, because of the emergency, and because of the terms and conditions of his contract with the creditor, is unable to prevent the immediate sale and sacrifice of the security pledged for the debt. ''

No such conditions existed in the Frye case. Frye was the owner of 400 acres in Scott county, 800 acres in Buchanan county, and 4,000 acres in Texas. He estimated his Scott county land as worth $100,000, and the Buchanan county land at $100,-000, but was not willing to encumber or sell any other property to pay the mortgage on the encumbered property, and did not propose to sell anything, or intend to pay the interest, nor the $10,000 principal. In this case the plaintiff is entitled to its money. It is hard for some people to pay a debt, but where they are able to pay, and especially where they are offered an extension if they will pledge something else, and there is no reason it cannot be pledged, they are not entitled to the same consideration they would have if they were to come strictly within the class for which the Moratorium Act was made. When the question is presented, it is for the district court, guided by the statute, to determine whether or not good cause has been shown why the continuance should not be granted. As to what is a good cause in such event is not provided in the statute, so the statute leaves it that the district court, in harmony with the provisions and purposes of the act, shall determine what shall be a good cause, and, if the court does not abuse its limited discretion in that event, this court will not interfere.

Reed v. Snow, 218 Iowa 1165, 254 N. W. 800, is an action to foreclose a second mortgage on certain property in the city of Ottumwa. In that case the district court continued the case. Appeal was taken and the case was reversed. The opinion calls attention to what was said in the Wilmarth case, saying:

''When the question is presented, it, of course, is for the district court guided by the statute to determine whether or not good cause has been shown why the continuance should not be granted.'' The opinion then goes on to say: ''But, when determining what is or is not good cause, the district court must keep in mind the purposes of the statute, together with the fact that under the statute the granting of the continuance is to be

the rule. Necessarily, then, the district court has a limited discretion in determining what shall or shall not be good cause for refusing the continuance." It says further: "We think the purpose of the statute was for the relief of debtors who were in financial distress and where there was a possibility of their being able to save their property within the time provided by the statute." The opinion says further: "However, the purpose and intent of this act, as we view it, was not to give this relief to those owners of property who are hopelessly insolvent and there could be no possible hope for them in the future. As suggested heretofore, this is not a case of saving a homestead or a home to these parties, as the record shows on its face."

The lower court in this case gave the defendants every opportunity possible to come to some sort of an agreement whereby they could keep off the foreclosure, but they refused to do anything; their attitude being that they wanted a discount on the money they had borrowed from the bank to enable them to get other property. The debtor was not facing any emergency which he could not out of his own resource meet. So, for these reasons, we arrive at the conclusion that the decision of the district court was right. It is therefore affirmed.

HAMILTON, ANDERSON, DONEGAN, POWERS, and RICHARDS, JJ., concur.