EDITH D. MILLER, Appellant, v. E. A. ELLISON et al., Appellees.

No. 43401.

March 18, 1936.

Rehearing Denied May 16, 1936.

Berry & Berry, for appellant.

Robert B. Pike and Larned F. Brown, for appellees E. A. Ellison and Emma G. Ellison.

Parsons, J.—This case is for the foreclosure of a mortgage for $20,000 given to secure a note of like amount to the Woodbury County Savings Bank of Sioux City, Iowa. The note was dated March 31, 1919, made payable April 1, 1929, with interest at 5½ per cent per annum, and 8 per cent after maturity, and provided that "if default be made in the payment of interest at the time same becomes due, or in any of the covenants or agreements contained in the mortgage collateral hereto, this note shall become due and collectible at once, without notice, at the option of the holder."

The mortgage contained provisions by which the mortgagor was to pay all taxes and assessments upon the premises, 200

acres of land, including personal taxes and taxes levied against the holder of the mortgage on account thereof before they became delinquent, and deliver receipt therefor, or duplicate thereof, to the mortgagee; and contained the further provision: "Upon breach of the warranty herein, or failure to comply with any agreement herein, the whole debt secured hereby becomes due and collectible at the election of the second party, and no notice of such election shall be necessary. Principal and interest due, either by reason of such breach or failure, or by lapse of time, shall thereafter bear interest at eight per cent per annum, payable semi-annually." It further provided for the plaintiff to have a receiver at the time of commencing the foreclosure, and further provided: "The mortgagee's right to said possession and receivership shall be complete, regardless of the sufficiency or insufficiency of the security, and regardless of the solvency or insolvency of the debtor. It is intended to confer upon the mortgagee the absolute right of possession of said premises. Such right shall continue through the year of redemption and until full payment of said indebtedness. Such proceedings shall not hinder foreclosure or collection by any lawful means."

On May 28, 1919, the Woodbury County Savings Bank assigned to Nancy A. Depew and Edith D. Adams the note and mortgage in suit. At the time of commencing the suit, September 2, 1932, there was due on the note as principal and interest the sum of $26,541.55, and in addition there were taxes, insurance, premiums, fee for extension of abstract, making the total amount due $26,951.16.

The defendants filed first a general denial on the 14th of October, 1932, and followed this by filing on the 20th of December, 1932, an amended and substituted answer denying the note in suit was due as alleged by the plaintiff, and stating that the time of payment of the obligation was extended to April 1, 1934, and set forth the copy of an agreement so extending time of payment of the note. The answer also set up that the index number of the Iowa Farm Products prices from 1910-1914 was 155, and that in 1919, when the loan was made, the index number was 228, and the value of the real estate mortgaged was then at least 100 per cent greater than the amount of the loan. The answer also alleged: "That since said extension of said note and mortgage, there has occurred, and now exists, an economic depression and financial crisis in severity unparalleled in history.

\* \* \* That as a result, there has been a depreciation of real estate values in general and farm values in particular, to such an extent that the value of the real estate mortgaged to plaintiff does not now exceed twenty per cent of its then value.'' And furthr alleged that the index number of Iowa Farm Products prices for the month of October, 1932, declined to the low level of 49, and further alleged that ''said real estate could not now be sold for a sufficient sum to pay more than a nominal part of the indebtedness claimed due to plaintiff, nor can any funds be borrowed by these defendants, either personally or upon said real estate as security, whereby said interest and taxes can be paid by them or their alleged obligation be liquidated.'' In other words, the loan being for $20,000, it is claimed that the value of the premises at the time the loan was made was $40,000; that the premises, at the time of filing petition, had decreased in value to a point not to exceed 20 per cent of the value at date of loan. In other words, the value then was only $8,000. It was also set out that he offered to do equity and consented that plaintiff have the rents and profits from said real estate, in such manner as the court might deem equitable, and further offered and tendered to pay into the court all rents and profits earned by said real estate since default was made in said obligation to plaintiff; and that plaintiff's refusing to stay proceedings upon defendants so doing, defendants offered to do equity in such manner and form as might be ordered by the court. Attached to the answer as ''Exhibit 1'' is the agreement for extension, signed by the defendant and his wife, which was made on the first day of April, 1929, acknowledging that the note and mortgage was unpaid, that there was due thereon as of date, $20,000, and recited: ''In consideration of the extension of the time of the payment thereof, said first parties hereby promise to pay and discharge when it shall become due as herein provided, together with interest accrued and to accrue.'' The extension signed only by the defendants contained this clause: ''In further consideration of the extension of the time of payment of the said note, as above provided, the said first parties agree to keep the money until the expiration of the time granted by this extension, and in further consideration of the extension of the time of the payment of said indebtedness secured by said mortgage the said first parties agree to keep and perform all of the conditions provided for in said mortgage to be kept and performed by the mortgagor,

and that each and all of the stipulations and conditions in said mortgage provided are to be and remain in full force and effect and are not changed hereby, except as to the time of payment of indebtedness secured by said mortgage.''

The plaintiff filed a reply, which was a general denial. The next step was the filing on March 16, 1933, of a motion that continuance of the cause be granted until March 1, 1935, pursuant to the laws of the state of Iowa. And on the 2d day of May, 1933, the court signed an order continuing the cause to March 1, 1935; and a receiver was appointed as provided in House File 193, Acts of the 45th General Assembly (chapter 182).

On March 17, 1934, the court on application of plaintiff, to clarify the order, made another order clarifying the first order.

Analyzing the case at the time these orders were filed, the defendant was owing to plaintiff on said mortgage the sum of over $27,000; his sworn answer set up that the property was then not worth more than $8,000, and on this he asked to delay the foreclosure, when the only property securing the mortgage, as set forth in his own answer, was not worth more than $8,000. It simply amounted to his asking the court to give him the privilege of redeeming property worth only $8,000 on which he had an indebtedness of $27,000. We fail to see how this would benefit the defendant; it couldn't help him in the least. This statute was made for the benefit of mortgagors who had a chance to pull out. But how can it be said that it in any way benefits a defendant to hold a property worth only $8,000 by the payment of $27,000 therefor? In that we think the court, in the original order making the first continuance, was wrong; that the continuance should have been there denied. But in the meantime, the plaintiff had entered into a contract in reference to the corn-hog contract, and was bound by the terms of that contract entered into under the orders of the court, and it was of such a nature that it seems to us that she could not further question the first order of continuance, which continued the case to March 1, 1935.

As to the granting of the first continuance, the defendant pleaded that the property covered by the mortgage did not exceed in value $8,000; there was due on the mortgage at that time about $27,000. In other words, taking the value at what the defendant in his answer claimed it to be, paid on the mortgage, there would be left a deficit of about $19,000, which

wouldn't pay one-third of the mortgage. So we think under the authorities that there was no justification for granting the first continuance.

The first case coming up under the moratorium statute as it existed at the time the first continuance was granted, is Federal Land Bank v. Wilmarth, 218 Iowa 339, 252 N. W. 507, 94 A. L. R. 1338. In that case, as in this, the defendant pleaded that the land had depreciated from $40,000 at the time the loan was made, to $10,000 at the time suit was commenced, and that money was more valuable than when the loan was made, and that $20,000 on the markets of the country would buy only as much as $10,-000 would buy today on the market; that these radical changes in values were not contemplated when the mortgage was executed. Speaking of this the court says, on page 350:

"Applying that philosophy to the case at bar, it is manifest that the appellant will be hindered rather than assisted in his argument. There is no question but that the transaction involving the note and mortgage was fair and lawful at the time the note and mortgage were executed."

The court points out that neither party had anything to do with the panic that had overtaken the country, and pointed out further that under all the cases presented for consideration it uniformly has been said that fluctuations in value do not relieve the debtor, and that equity cannot arbitrarily grant relief in the face of the Constitution of the United States and the laws thereof to which the state is subject; and that the same was true as to section 10, article I of the United States Constitution, and that the state cannot in any event adopt a policy which would repudiate debts, destroy contracts, or deny the means to enforce such obligations, citing Home Building & Loan Association v. Blaisdell, 290 U. S. 398, 54 S. Ct. 231, 78 L. Ed. 413, 88 A. L. R. 1481. The court further said, on page 354:

"The purpose of the statute is to afford the owner of the land an opportunity to refinance or pay up the indebtedness and save his farm within the moratorium period. But the appellant, as already indicated, will not be in a position to pay the obligation and redeem the farm within the period of the moratorium. He is hopelessly involved financially. Not only is the appellant insolvent, but he has no property with which to make any pay-

ment on the judgment aside from the mortgaged land. While the insolvency is not the deciding point, it is a material consideration. Clearly the appellant has no prospect-of refinancing or funding the indebtedness within the moratorium period."

Chapter 182 of the 45th General Assembly, being H. F. 193, provided for the continuance of foreclosures to March 1, 1935, under conditions set forth in the act. The 46th General Assembly, in chapter 115, S. F. 34, provided for further delay in foreclosure, and that the court, upon application of the owner or owners of such real estate who are defendants in said cause, shall, upon hearing upon an application filed for continuance, order said cause continued until March 1, 1937. That applied to all foreclosures that were then pending. It then provided for orders of the court as to protecting the rights of the parties. This act went into effect on February 7, 1935. And under this act the defendant then made the application to have the case continued to March 1, 1937. A judge from another district, who was holding court in Sioux City, was called in and heard the matter. Evidence was taken and the court granted the continuance to March 1, 1937. After hearing the evidence the judge found that the present reasonable value of the property was $30,000, with reasonable expectancy of further increase in value, and that the defendant may reasonably expect to arrange for refinancing or reducing the mortgage by March 1, 1937; that the plaintiff had not shown good cause why the case should not be continued to March 1, 1937. Granting that the property was of the reasonable value of $30,000, with the defendant in possession acting as this defendant has acted, is there any reason to apprehend that he can or will arrange for the refinancing of the mortgage without at least cutting the plaintiff's claim in two? It can't be done. And we think the court went the limit in making this finding. Federal Land Bank v. Wilmarth, 218 Iowa 339, 252 N. W. 507, 94 A. L. R. 1338; Reed v. Snow, 218 Iowa 1165, 254 N. W. 800; Decorah State Bank v. Sexton, 220 Iowa 1047, 264 N. W. 41; Butenschoen v. Frye, 219 Iowa 570, 258 N. W. 769. At the time of the hearing there had been paid only $100 on the mortgage indebtedness since the commencement of the action to foreclose, September 2, 1932; the order granting this continuance being entered on the 28th of September, 1935. At the time of the entering of this last order the whole of the

old debt existed; practically nothing had been paid on it. The debt at the time of the beginning of foreclosure amounted in round numbers to $27,000; it bore interest by reason of the terms of the mortgage of 8 per cent; there had accumulated on the mortgage then over two years of interest, or about $4,320, making a total of at least $31,320 due on the mortgage at the time of the entry of the order continuing the case to March 1, 1937. The effect of the order was to say to the plaintiff that she could not go on and foreclose her mortgage, even try the foreclosure, until March 1, 1937, by which time the mortgage itself would have grown by the accruing of interest to $37,592. In addition thereto the taxes have not been paid, and up to 1937 they would have accrued five years, and would amount to more than $1,128; and there would be at least $400 court costs accrued by that time, making a total of $39,000 to be made out of this place, with the defendant still having the right to contest the mortgage foreclosure, to delay all he could, and it would be at least after March 1, 1938, probably, long enough to destroy the use of the farm as a renting proposition for the latter year, in which the plaintiff could realize on her foreclosure by getting title to the property, thus running the total indebtedness up to considerably over $40,000.

We do not think it could have been the intention of the framers of the law that such results could be brought about under the statute. If so, the statute would be plainly and palpably an absolute confiscation of the rights of the plaintiff to enforce her mortgage, would deprive her of any benefit from it; even then foreclosing, or for the time she could get possession under her mortgage, the debt would have more than doubled. And, further, there is no reasonable prospect showing that the defendant is in any position to redeem the land at the end of either extension period. He owed the Woodbury County Savings Bank $2,000; he owed $300 to his brother; he owed about $4,000 to another bank—with no possibility that he would have taken care of these things within that time, or that he could ever redeem the land charged as it was with the payment of taxes and interest, exceeding $2,000 a year.

Further, the record in the case shows that the defendant has done everything he could to try to absorb every dollar the land produced; that he doesn't recognize there is any liability upon him to pay this woman the amount he owed her, or any-

where near the amount; that he has had opportunity to compromise the same for practically thirteen or fourteen thousand dollars; that he has made no real efforts to do it; that the plaintiff herein had given a note of about $1,400 to the Woodbury County Savings Bank, giving the mortgage in suit as collateral; and that this defendant, learning that, started out to take steps, as he said, "looking after my own interest," to get hold of this mortgage, either for himself or for a friend, by having the bank sell it on the collateral owing to plaintiff and then turn it over to him. How much would plaintiff get if he got this? The plaintiff herself took up the collateral note at the Woodbury County Savings Bank by giving a mortgage on her homestead; she is practically without means. During the time this case has been pending, the defendant was employed under the corn-hog administration by the government, and when examined upon this he evaded what he was receiving per day, but it was ascertained he got $8 a day, or something over $2,000; that he received items under the corn-hog contract with the government, running a total amount he received during this time to $3,200; and there is no showing what he did with any of it, or that he contributed to pay the taxes on the place during that time. He claims a bill of several hundred dollars himself while he was staying on this farm, against plaintiff, for expense and trouble producing crops, etc. This defendant is not in court with clean hands. He is undertaking to beat this woman; he doesn't want to pay a dollar voluntarily, and has to be forced out, and under these conditions the court made a mistake; it was wrong in granting a continuance to March 1, 1937.

The defendant has not done equity; he isn't willing to do equity, and cannot be forced to do equity, and it is out of his power on account of his financial condition to do equity.

So considering the whole case, and for the reason that the defendant has not done equity, and has not sought to do equity, and in fact has evinced an intention to really do nothing for the relief of the plaintiff, unless he can get the mortgage cut down by plaintiff, whereby she will relinquish more than half of what she is legally entitled to, and for the further reason that it appears affirmatively from the evidence in the case that the defendant cannot and will not ever be able to redeem from the mortgage in suit, the decision of the court below is reversed, and it is ordered that the case be remanded to the district court of

Woodbury county, Iowa, and that that court proceed with all reasonable dispatch to the hearing of the case, that the matter of the foreclosure may be settled.—Reversed and remanded.

DONEGAN, C. J., and ALBERT, KINTZINGER, HAMILTON, and STIGER, JJ., concur.